IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ERIC GREEN,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 1:26-cv-0097<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Eric Green filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I REVERSE and REMAND the Commissioner's decision.

**Procedural background**

In March 2024, Green applied for disability insurance benefits.[1] Tr. 225. In his application, Green alleged a disability onset date of October 20, 2023,[2] Tr. 313, claiming that he was disabled and limited in his ability to work due to

---

1 Green initially filled out his application in January 2023, *see* Tr. 68, but the Social Security Administration did not receive it until March 2024, Tr. 225, 227; *see* C.F.R. 20 § 404.614.

2 "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

fibromyalgia,[3] depression, and anxiety, Tr. 271. After the Commissioner denied Green's application initially, Tr. 98–101, and on reconsideration, Tr. 104–06, Green requested a hearing before an administrative law judge (ALJ), Tr. 107.

In April 2025, Green appeared and testified at a telephonic hearing before an ALJ. Tr. 38, 44–59. Green was represented by counsel. Tr. 38. A qualified vocational expert, Aimee Mowery, also testified. Tr. 60–66. The following month, the ALJ issued a written decision finding that Green was not entitled to benefits. *See* Tr. 17–30. The Appeals Council declined further review, making the ALJ's decision the final agency decision. Tr. 1; *see* 20 C.F.R. § 404.981.

Green timely filed this action in January 2026. Doc. 1. In it, he presents the following issues for review:

1. Whether the ALJ failed to provide good reasons for discounting Plaintiff's credible symptoms associated with fibromyalgia, depression, and anxiety.

2. Whether the ALJ's mischaracterization and selective review of the record led to an improper evaluation of Dr. Kammer's opinion.

---

[3] Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." Dorland's Illustrated Medical Dictionary, at 696 (33d. ed. 2020). A fibromyalgia diagnosis involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007) (quoting *Preston v. Sec'y of Health Hum. Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)).

Doc. 7, at 1.

**Evidence**[4]

*Personal and Vocational Evidence*

Green was born in 1971, making him 51 years of age on his alleged disability onset date. Tr. 150. Green did not graduate from high school but received an associate's degree from an online program. Tr. 45, 285. From 2014 to 2023, Green worked as a parts tester for a manufacturing company, where he picked up boxes of computer parts, tested the parts, and put them in inventory. Tr. 45–46, 285. Mowery described Green's past work as a combination of parts tester and hand packager. Tr. 60. Green said that he was on his feet for work about three to four hours per day and lifted up to 30 pounds. Tr. 46.

*Medical Evidence*

Green complained of back and knee pain long before his alleged disability onset date. *See* Tr. 366, 368. In October 2019, Green presented to Gary M. Kammer, MD, with complaints of "left leg fatigue and muscle pain in the posterior and anterior aspects of the left thigh." Tr. 360. Green described the pain as migrating "down to [his] distal leg and left foot" and being severe enough to prevent him from walking more than "half the length of a football

[4] The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

field" without stopping to rest. Tr. 360. Green also reported experiencing restless legs for the past two years. Tr. 393. Although an x-ray revealed "mild dextroscoliosis" in Green's lumbar spine,[5] it was otherwise unremarkable. Tr. 368. Later in October, Green returned with complaints of fatigue and "[w]idespread pain" across his body. Tr. 384. Dr. Kammer diagnosed Green with fibromyalgia and prescribed duloxetine. Tr. 386.

By March 2021, Green reported that his leg pain had resolved, although he continued to experience restless legs and muscle fatigue. Tr. 388. About a year later, however, Green again reported varying degrees of pain in his knees, lower back, stomach muscles, and arms. Tr. 379. Dr. Kammer also observed "widespread pain, dysesthesias, easy fatigability, muscle fatigue, impaired stamina, insomnia, and many other characteristic findings of [fibromyalgia]." Tr. 382. Dr. Kammer recommended that Green continue using duloxetine, along with tizanidine for musculoskeletal pain and insomnia. Tr. 382.

Green stopped working in October 2023, Tr. 579, and the following month, he received a psychiatric diagnostic evaluation for depression. Tr. 573, 579. Green reported taking anxiety medication for years without

---

[5] "[D]extroscoliosis is a specific term meaning scoliosis of the spine with a curvature of the spine to the right." *See Dextroscoliosis*, Scoliosis Solutions, https://www.scoliosisbrace.ca/dextroscoliosis/ (last visited September 9, 2026); *Durham v. Comm'r of Soc. Sec.*, No. 12-cv-14039, 2013 WL 5676282, at *8 n.22 (E.D. Mich. Oct. 18, 2013). In turn, scoliosis means "[a]bnormal lateral and rotational curvature of the vertebral column." *Rammel v. Comm'r of Soc. Sec.*, No. 3-12-cv-02078, at *2 n.1 (citing Stedman's Medical Dictionary 367500 (27th ed. 2000)).

improvements, Tr. 579, noting that his depression and anxiety began in elementary school, Tr. 573. Green acknowledged feeling depressed most days, while denying a decreased need for sleep, impulsivity, racing thoughts, hallucinations, or delusions. Tr. 573. On mental status examination, Green exhibited a restricted affect and fair insight, but he was appropriately dressed and groomed, with intact memory and a normal thought process. Tr. 576. A mental health provider diagnosed Green with moderate depression and anxiety. Tr. 577.

When Green returned to the mental health provider in February 2024, Green said that he was "still depressed," Tr. 579, and demonstrated a blunted affect, Tr. 581. Green reported experiencing insomnia, poor concentration, lack of motivation, helplessness, and indecisiveness. Tr. 579. He described his sleep as "horrible," explaining that anxiety and racing thoughts had affected his ability to sleep. Tr. 579. Green acknowledged using edible marijuana at night to manage his racing thoughts. Tr. 579. Green's provider diagnosed Green with unspecified social phobia, recurrent and moderate major depressive disorder, and prescribed Remeron and increased Green's dosage of Effexor. Tr. 582–83. Two weeks later, Green reported feeling "a little better." Tr. 584.

In March 2024, Green followed up with Dr. Kammer regarding fibromyalgia, while reporting continued symptoms of pain and fatigue. Tr. 787–88. Although Green appeared unwell and anxious, he was not in acute distress. Tr. 788. A clinical examination revealed generalized musculoskeletal

tenderness, with more than 15 fibromyalgia tender points above and below the waist, alongside findings of costochondritis,[6] metatarsalgia,[7] heel pain, and plantar fasciitis. Tr. 788–89. Green also had a tachycardic heart rate,[8] with diminished pulses in his groin, posterior knee, and feet. Tr. 788. In addition to fibromyalgia, Dr. Kammer diagnosed Green with tachyarrhythmia and poor circulation of extremities. Tr. 789.

In April 2024, Dr. Kammer completed a physical residual functional capacity (RFC) assessment form regarding Green's physical limitation.[9] Tr.

---

[6] Costochondritis is "an inflammation of the cartilage that connects a rib to the breastbone." *Costochondritis*, Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/costochondritis/symptoms-causes/syc-20371175 (last visited on September 3, 2026); *see White v. Comm'r of Soc. Sec.*, No. 1:12-cv-835, 2014 WL 29099, at *3 n.1 (W.D. Mich. Jan. 3, 2014).

[7] Metatarsalgia is "a condition in which the ball of the foot becomes painful and irritated." *Metatarsalgia*, available at https://www.mayoclinic.org/diseases-conditions/metatarsalgia/symptoms-causes/syc-20354790 (last visited on September 3, 2026); *see Mills v. Comm'r of Soc. Sec.*, No. 1:11-cv-1341, 2013 WL 967567, at *5 n.4 (W.D. Mich. Mar. 12, 2013).

[8] "Tachycardia … is the medical term for a heart rate above 100 beats per minute." *Tachycardia*, Mayo Clinic, Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127 [https://perma.cc/RT25-WCVK]. Relatedly, tachyarrhythmia means "any disturbance of the heart rhythm in which the heart rate is abnormally increased, usually to greater than 100 beats per minute in an adult." Dorland's Illustrated Medical Dictionary 1850 (33d. ed. 2020).

[9] A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and

590–591. Dr. Kammer opined that Green could lift up to 15 pounds occasionally and stand and walk for three to four hours during a workday.[10] He further limited Green to occasional reaching, pushing, pulling, and both fine and gross manipulation. Tr. 590–91. Dr. Kammer described Green's pain as varying from moderate to severe, noting that the pain would interfere with concentration, cause off-task time, and result in absenteeism. Tr. 591. He added that Green may require additional time to complete tasks due to brain fog and impaired short-term memory. Tr. 591.

The next month, Patrick Tessman, MD, evaluated Green for complaints of fatigue, depression, weakness, confusion, blurry vision, and brain fog. Tr. 657. Dr. Tessman observed that Green had a blunted affect but was otherwise normal. Tr. 658. Cognitive testing likewise placed Green within normal ranges across multiple domains, Tr. 689–95, despite his depressed mood and "mild to moderate range" of anxiety, Tr. 692–93. A brain MRI was also unremarkable. Tr. 714.

In September 2024, Green visited Julie Gauntner, who was a nurse practitioner at the Cleveland Clinic. Tr. 886–87. He reported increased depression, diminished interest, poor sleep, increased pain, low energy, poor

---

cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

10 In the disability context, "'[o]ccasionally' means occurring from very little up to one-third of the time." Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5. On the other hand, "[f]requent' means occurring from one-third to two-thirds of the time." *Id.*

appetite, irritability, racing thoughts, ruminations, and paranoia. Tr. 886–87. While Green appeared normal on mental status examination, showing good judgment and intact memory, Tr. 892, Gauntner diagnosed unspecified depression and anxiety, Tr. 892–93. She also began cross-tapering Effexor with duloxetine, noting that the transition could result in "some mild discomfort or transient worsening of anxiety or depression." Tr. 893. The following month, when Green reported poor energy, nightmares, and passive suicidal ideation, Tr. 1032, Gauntner adjusted Green's medication regimen to increase Effexor and add Wellbutrin while continuing Gabapentin, Tr. 1038.

In late October, Green began weekly psychotherapy sessions with Catherine Stenroos, PhD, Tr. 1026, focusing on anger management and interpersonal boundaries, Tr. 1029. At the time, Green continued to feel irritable and anxious, Tr. 1027, while also reporting diminished interest, difficulty falling asleep, decreased concentration, poor appetite, suicidal ideation, and forgetfulness, Tr. 1028. Dr. Stenroos diagnosed Green with depressive mood disorder, post-traumatic stress disorder, and anxiety disorder. Tr. 1029. In December, Gauntner observed "overall improvement" in Green's mood and discontinued Gabapentin due to urinary side effects. Tr. 996. Green's mood continued to improve into early 2025, Tr. 1223, 1237, but in March 2025, Green reported increased anxiety and irritability, along with a recent panic attack and night sweats, Tr. 1177, 1189, prompting Gauntner to increase duloxetine dosage, Tr. 1188.

*State Agency Opinions*[11]

Meanwhile, in May 2024, state agency medical consultants initially reviewed Green's claim. *See* Tr. 73–74. The consultants observed that while Green's pain, weakness, and fatigue were "reasonably attributable" to Green's medically determinable impairments, the intensity of these symptoms was "not fully consistent with the totality of the evidence." Tr. 74. In support of this finding, the consultants emphasized that Green exhibited normal muscle strength and a stable gait. Tr. 74. They added that while Green alleged attention deficits due to depression and anxiety, "he displayed no attention or concentration difficulties during his psychiatry appointments." Tr. 74. The consultants also found Dr. Kammer's RFC assessment only partially supported, reasoning that Dr. Kammer "relie[d] heavily on [Green's] subjective report of symptoms and limitations." Tr. 74. Instead, the consultants concluded that Green could lift and carry up to 20 pounds occasionally and ten pounds frequently, and could sit, stand, or walk for up to six hours during a day. Tr. 74–75. On reconsideration, state agency consultants affirmed these conclusions regarding Green's physical and mental limitations. *See* Tr. 87–88.

---

[11] When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether—and how much—the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

*Hearing testimony*

In April 2025, Green, who was represented by counsel, appeared and testified by phone at an administrative hearing. Tr. 38, Tr. 44–59. Green stated that "major fatigue" and constant pain across his body prevented him from working. Tr. 46–47. While the pain was "mostly in [Green's] legs" at first, it then spread across Green's body, including back, arms legs, ankles, and feet. Tr. 47. The pain also intensified with activities and became "stabbing, hurting" by the end of the day. Tr. 47–48. Green rated his pain as six out of ten on average, noting that it would be worse without his anxiety and depression medications, which, according to Green, also helped alleviate his fibromyalgia symptoms. Tr. 48.

At the time of the hearing, Green lived with his wife and an adult son. Tr. 44. Because Green reported having memory deficits, his wife had to manage Green's medication schedule. Tr. 59. Green also experienced brain fog, which undermined his ability to concentrate, Tr. 46, and episodes of "anxiety, panic attacks …, anger and aggression," Tr. 54. Regarding his physical capabilities, Green testified that he could comfortably sit for 30 minutes to an hour, stand for 20 minutes, and walk for 15 minutes. Tr. 48–49. Tr. 49. Green also could lift about 10 to 15 pounds. Tr. 49. Green emphasized that he had "lost a lot of strength" over the years, Tr. 49, and could no longer hold an ice cream bar in one hand, Tr. 52–53. He felt sharp pain when attempting to make a fist, Tr. 55, or when putting shoes on, Tr. 58.

Green had a driver's license and previously drove once a month to his medical appointments, Tr. 45, yet he had not driven since his duloxetine dosage increased weeks before, Tr. 54. Green explained that he was now afraid of driving due to his anxiety and panic attacks. Tr. 54. Green denied visiting friends or family, instead spending his free time lying on the couch and watching television—activities that Green described as "the only thing[s] [he] [could] really do comfortably." Tr. 49. Even when watching television, however, Green said that his mind would wander, and he would forget what had happened. Tr. 49–50. Still, Green could count money, make change, and use Facebook "to keep up with … the news." Tr. 50. Green could also pick up after his pets, push a lawnmower, and vacuum, Tr. 50–51, but he had to rest after vacuuming for 15 minutes, Tr. 50–51, or mowing for five minutes. Tr. 52. Green's wife and son performed all other house chores. Tr. 51.

Qualified vocational expert, Aimee Mowery, also testified. Tr. 59–65. The ALJ posited to Mowery a hypothetical individual with Green's age, education, relevant work experience, and physical and mental limitations assessed by the state agency consultants. Tr. 62–63. Mowery responded that the individual would not be able to perform Green's past work but could still work as mail clerk, shipping and receiving weigher, and marker. Tr. 62–63. Next, when the ALJ asked whether the same individual could maintain employment if he were off-task 20 percent of the workday or absent two days per month, Mowery stated that either limitation would be work-preclusive. Tr.

63. Mowery added that most employers would tolerate off-task behavior "up to 10% in a workday" and allow no more than one absence per month. Tr. 63. She further testified that the individual could not perform any work at the sedentary exertional level, Tr. 63–64, explaining that the limitation to standing and walking three or four hours a day would result in a sedentary RFC, Tr. 64. Green's counsel then asked whether work would be available for a hypothetical individual who could "only occasionally push and pull and reach in all directions," and Mowery answered that the limitations would likewise be work-preclusive. Tr. 64.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant met the insured status requirements of the Social Security Act through December 31, 2028.
>
> 2. The claimant has not engaged in substantial gainful activity since October 20, 2023, the alleged onset date (20 CFR 404.1571 *et seq*.).
>
> 3. The claimant has the following severe impairments: fibromyalgia, mild scoliosis, bladder neck contracture/urethral stricture, small hiatal hernia, plantar fasciitis, hyperlipidemia, restless leg syndrome, obstructive sleep apnea, miosis, depression, anxiety, and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch, and crawl. The claimant can never work in high, exposed places, have proximity to moving mechanical parts, drive, or operate machines, or equipment. The claimant can understand, remember, and carry out simple instructions, can perform work without a specific production rate pace, such as an assembly line or hourly production quotas, can use his judgment to make simple work-related decisions, can deal with occasional changes in a routine work setting, can occasionally interact with supervisors and coworkers, and never interact with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was … 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 20, 2023, through the date of this decision (20 CFR 404.1520(g)).

Tr. 19–29.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ must follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

In his first assignment of error, Green contends that the ALJ violated Social Security Ruling (SSR) 16-3p in evaluating Green's subjective symptoms. Doc. 7, at 13. Green claims that "the ALJ relied on boilerplate language, selectively cited evidence, made inconsistent statements, and mischaracterized the record, all in an effort to discounting … Green's credible symptoms." Doc. 7, at 13. In particular, Green challenges the ALJ's evaluation of his fibromyalgia symptoms, arguing that "the ALJ improperly relied on the absence of objective medical evidence," Doc. 7, at 14, and "selectively relied on isolated normal findings," Doc. 7, at 15.

Social Security Ruling (SSR) 16-3p governs the ALJ's evaluation of subjective symptoms, which was formerly referred to as a "credibility" determination in SSR 96-7p.[12] Under SSR 16-3p, an ALJ undertakes a two-

---

[12] In relevant part, SSR 16-3p removed the word "credibility" from its predecessor and refocused the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2. Despite these changes, the procedures for reviewing an ALJ's assessment under SSR 16-3p are substantially the same as the procedures under SSR 96-7p. *See Delong v. Comm'r of Soc. Sec.*, No. 2:18-cv-368, 2019 WL 409364, *7–8 (S.D. Ohio Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1010532 (S.D. Ohio Mar. 4, 2019). Courts agree that the prior case law involving SSR 96-7p generally applies to the renamed "consistency determination" under SSR 16-3p. *Whicker-Smith v. Comm'r of Soc. Sec.*, No. 1:18-cv-52, 2019 WL 911084, at *5 (S.D. Ohio, Feb. 25, 2019), *report and recommendation adopted*, 2019 WL 1202361 (S.D. Ohio Mar. 14, 2019).

step process to assess the limiting effects of a claimant's symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304 (SSA Oct. 25, 2017), at *2. At step one, "the ALJ will ask whether … there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)); SSR 16-3p, 2017 WL 5180304, at *3. At step two, "if … such an impairment exists," the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers*, 486 F.3d at 247; Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," an ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(4). Aside from medical evidence, SSR 16-3p requires the ALJ to consider: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(3). To be sure, "[t]he ALJ need not analyze all seven factors, but should show that

he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

SSR 12-2p offers separate instructions as to "how [SSA] develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how [SSA] evaluate[s] fibromyalgia in disability claims." Soc. Sec. Ruling 12-2p, 2012 WL 3104869 (SSA July 25, 2012) at *1; *see also Rossi v. Comm'r of Soc. Sec.*, No. 1:25-cv-00625, 2025 WL 1671796, at *9 (N.D. Ohio Dec. 18, 2025) ("SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia."), *report and recommendation adopted*, 2026 WL 309536 (N.D Ohio Feb. 5, 2026). SSR 12-2p recognizes that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations that prevent a person from performing a full range of unskilled work." Soc. Sec. Ruling 12-2p, 2012 WL 3104869 (July 25, 2012), at *6. Individuals with fibromyalgia "may also have nonexertional physical or mental limitations because of their pain or other symptoms." *Id.* Fibromyalgia's unique characteristics, however, do not change the ALJ's analysis under SSR 16-3p. *See James v. Comm'r of Soc. Sec.*, No. 1:22-cv-1915, 2023 WL 4172932, at *18 (N.D. Ohio June 5, 2023).

To evaluate a claimant's fibromyalgia symptoms, ALJs must use the same SSR 16-3p factors that they use to evaluate symptoms of any other medically determinable impairment. *See Haines v. Comm'r of Soc. Sec.*, No.

4:24-cv-0228, 2024 WL 3822695, at *9 (N.D. Ohio Aug. 15, 2024), *report and recommendation adopted*, 2024 WL 4008218 (N.D. Ohi Aug. 30, 2024). That said, courts in this Circuit have emphasized that "'[t]he nature of fibromyalgia undercuts the efficacy of many of these factors and muddies the legal analysis.'" *Mullins v. Comm'r of Soc. Sec.*, 3:25-cv-1652, 2026 WL 1465520, at *8 (N.D. Ohio May 26, 2026) (quoting *Cooper v. Comm'r of Soc. Sec.*, No. 4:13-cv-11883, 2014 WL 4606010, at *23 (E.D. Mich. June 17, 2014), *report and recommendation adopted*, 2014 WL 4607960 (E.D. Mich. Sept. 15, 2014))., *report and recommendation adopted*, 2026 WL 2474179 (N.D. Ohio Aug. 24, 2026); This is because fibromyalgia, "unlike medical conditions that can be confirmed by objective testing, … present[s] no objectively alarming signs. *Rogers*, 486 F.3d at 243. Indeed, another unit of this Court has described fibromyalgia as an "elusive" and "mysterious disease," which "has no known cause and no known cure." *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003). Nor is there an objective test that can conclusively determine fibromyalgia, as fibromyalgia patients "manifest normal muscle strength and neurological reactions and have a full range of motion." *Preston v. Sec. of Health & Hum. Servs.*, 854 F.2d 815, 818, 820 (6th Cir. 1988) (per curiam); *see also Rogers*, 486 F.3d at 243–44 (discussing *Preston*).

Here, the ALJ acknowledged that Green "continued to experience fibromyalgia related symptoms," including "fibromyalgic points above and below his waist." Tr. 25. The ALJ thus agreed that, at step one, Green's

medically determinable impairment of fibromyalgia "could reasonably be expected to cause the alleged symptoms." Tr. 24; *see* SSR 16-3p, 2017 WL 5180304, at *3. At step two, however, the ALJ concluded that "Green's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 24; *see* SSR 16-3p, 2017 WL 5180304, at *3. For one, the ALJ observed that daily activities described by Green went far beyond "the extent one would expect, given the complaints of disabling symptoms and limitations" and "demonstrate[d] [Green's] ability to lift, squat, bend stand, walk, kneel, and use his hands." Tr. 24. The ALJ also noted that despite alleged pain and symptoms, Green had "a normal gait and his motor strength was normal in all of his extremities." Tr. 25. Further, in discounting Dr. Kammer's RFC assessment as unpersuasive, the ALJ noted that Dr. Kammer used "a checkbox form that lack[ed] substantive explanation" and that Dr. Kammer's "extreme limitations [were] unsupported by [Green's] progress reports and conservative treatment." Tr. 27.

In fibromyalgia contexts, however, Green's daily activities—such as cleaning, driving, vacuuming, and occasional mowing—are "somewhat minimal daily functions … not comparable to typical work activities." *Rogers*, 486 F.3d at 248 (holding that a fibromyalgia patient's symptoms were credible despite the patient's ability to "drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news"); *see also*

*Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011) (holding that a fibromyalgia patient's ability to perform "minimal activities," such as preparing meals and dressing herself without assistance, did not justify discrediting the patient's testimony); *Cooper*, 2014 WL 4606010, at *17 ("[T]he ability to complete quotidian activities like personal care and driving does not signify the claimant is capable of a full day's work."). Moreover, both the ALJ and the Commissioner here have mischaracterized Green's testimony regarding the scope of his daily activities. *Compare* Tr. 24 *and* Doc. 9, at 3, *with* Tr. 50–51, 52. While the ALJ emphasized Green's abilities to vacuum, drive, and use a push mower as evidence that Green could perform typical work activities, Tr. 24, Green in fact testified that he became exhausted and required a rest after vacuuming for 15 minutes, Tr. 50–51, or mowing for five minutes, Tr. 52, and that he drove only once a month for medical appointments, Tr. 45. Green also testified that he could no longer hold an ice cream bar in one hand, Tr. 52–53, make a fist, Tr. 55, or put on his shoes, Tr. 58, but the ALJ failed to note or comment on this evidence. *See Rogers*, 486 F.3d at 249 (noting the ALJ's failure to comment on the fact that the claimant "receive[d] assistance for many everyday activities and even personal care").

The ALJ's comment that Green underwent only "conservative treatment" is also troubling. Tr. 27. Courts have made clear that "a generalization of 'conservative treatment' is irrelevant to whether [a claimant's] fibromyalgia was severe enough to be completely disabling."

*Huffman v. Saul*, No. 5:19-cv-449, 2020 WL 6937441, at *7 (E.D. Ky. Nov. 24, 2020); *see also Selman v. Colvin*, No. 1:13-cv-2556, 2014 WL 6461363, at *13 (N.D. Ohio Nov. 17, 2014) ("[T]he ALJ's determination that [a claimant] lacked credibility [regarding the claimant's claims of disabling pain] because her treatment was 'mostly conservative in nature' is also irrelevant in the context of fibromyalgia."). To be sure, SSR 16-3p instructs ALJs to consider treatment that a claimant receives to alleviate the claimant's symptoms, 2017 WL 5180304, at *7–8; *see* 20 C.F.R. § 404.1529(c)(3)(v), but an ALJ's emphasis on the claimant's conservative fibromyalgia treatment "suggests that [the ALJ] did not account for the nature of fibromyalgia in assessing [the claimant's] RFC." *Tatum S. v. Comm'r of Soc. Sec.*, No. 2:24-cv-00932, at *4 (S.D. Ohio April 1, 2026); S*unshine K. v. Comm'r of Soc. Sec.*, No. 3:23-cv-00582, 2025 WL 903838, at *7 (W.D. Ky. Mar. 25, 2025); *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852 (6th Cir. 2011) ("[M]ore 'aggressive' treatment is not recommended for fibromyalgia patients."). Courts, therefore, "should be wary of an ALJ's rationale for denial that relies on ... a conservative treatment approach." *Cooper*, 2014 WL 4606010, at *20.

Further, while the ALJ repeatedly highlighted Green's normal motor strength, gait, and range of motion, Tr. 25, these observations are irrelevant to symptoms of fibromyalgia, *see Rogers*, 486 F.3d at 248 (noting that individuals with fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range of motions"), and therefore do not support the

ALJ's assessment. Rather, when it comes to fibromyalgia, "physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Preston*, 854 F.2d at 818. Accordingly, "objective tests or observations of muscle strength, range of motion, joint swelling and neurological reactions are of limited or no value in the typical fibromyalgia case as these signs would not ordinarily be expected." *Shaw v. Comm'r of Soc. Sec.*, No. 1:16-cv-1133, 2018 WL 377383, at *4 (S.D. Ohio Jan. 11, 2018), *report and recommendation adopted*, 2018 WL 806286 (S.D. Ohio Feb. 9, 2018); *see also Swain*, 297 F. Supp. 2d at 993 n.51 (noting that "no evidence of acute muscular or joint inflammation" is "typical in fibromyalgia cases").

This is not to say that Green was necessarily disabled during the relevant period. The Sixth Circuit has held that a diagnosis of fibromyalgia "does not automatically entitle [the claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008); *see also Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [the claimant] is one of the minority."). That said, fibromyalgia is an illness "where subjective complaints play an important role in the diagnosis and treatment of the condition," *Rogers*, 486 F.3d at 248, and the law requires the ALJ to properly evaluate Green's fibromyalgia symptoms without placing undue weight on the lack of objective evidence or on

Green's ability to perform minimal daily activities. Instead, the unique nature of fibromyalgia makes "providing justification for discounting a claimant's statements [of disabling pain] … particularly important." *Id.* Because the ALJ has failed to do so, the Court concludes that the first assignment of error has merit and remands the ALJ's decision for further proceedings.[13]

**Conclusion**

For all the reasons stated, I reverse and remand the Commissioner's decision.

Dated: September 10, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

---

[13] Because the Court has concluded that remand is warranted based on Green's first assignment of error, the second assignment of error relating to the medical opinion evidence need not be discussed.